Filed 1/6/14  Johnson v. San Diego Unified Port Dist. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| TIMOTHY JOHNSON, Individually and as Personal Representative, etc., et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>SAN DIEGO UNIFIED PORT DISTRICT,<br><br>    Defendant and Respondent. | D061862<br><br><br>(Super. Ct. No. 37-2010-00083114-CU-PO-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Richard E. L. Strauss, Judge.  Affirmed.

Tosdal, Smith, Steiner & Wax, Thomas Tosdal and Kathryn A. Schultz; Tosdal Law Firm and Thomas Tosdal, for Plaintiffs and Appellants.

Liedle, Lounsbery, Larson & Lidl and Matthew J. Liedle; Ellen Gross, Deputy Port Attorney; Richard H. Benes for Defendant and Respondent.

Robert Johnson's adult children and his estate representative (plaintiffs) sued the San Diego Unified Port District (Port) alleging a dangerous condition on the Port's

property contributed to Robert's death in an automobile accident. Plaintiffs' central theory was that the Port should have placed warning signs on the road where the accident occurred. The court granted the Port's nonsuit motion based on the governmental immunity set forth in Government Code section 830.4.[1] We determine the court erred in ruling that plaintiffs' claims were barred by section 830.4, but affirm the judgment on the basis the Port is immune from liability under section 830.8.[2]

RELEVANT FACTS AND PROCEDURE

*Background*

In April 2009, Robert and Margaret Johnson were visiting with Robert's daughter, son-in-law, and grandchild at the Sheraton Hotel on Harbor Island. At about 10:45 p.m., Robert and Margaret left the hotel in their van. Margaret was driving and Robert was in the passenger's seat. From the hotel parking lot, Margaret turned southbound on Harbor Island Drive towards Harbor Island Drive, which parallels San Diego Bay. These two

---

[1] Section 830.4 states: "A condition is not a dangerous condition within the meaning of this chapter merely because of the failure to provide regulatory traffic control signals, stop signs, yield right-of-way signs, or speed restriction signs, as described by the Vehicle Code, or distinctive roadway markings as described in Section 21460 of the Vehicle Code." Further statutory references are to the Government Code unless otherwise specified.

[2] Section 830.8 states: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the failure to provide traffic or warning signals, signs, markings or devices described in the Vehicle Code. Nothing in this section exonerates a public entity or public employee from liability for injury proximately caused by such failure if a signal, sign, marking or device (other than one described in Section 830.4) was necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care."

streets have the same names. For clarity, we refer to the street paralleling the bay as "Main Harbor Island Drive," and we refer to the north-south street on which Margaret was driving from the hotel as "South Harbor Island Drive."

South Harbor Island Drive has a posted speed limit of 35 miles per hour, and Margaret was driving at or below the speed limit. When Margaret reached Main Harbor Island Drive, there is a T-intersection with a traffic signal at which the cars must go left or right. The San Diego Bay is at the top of the T-intersection beyond a narrow strip of grass. Before the T-intersection, South Harbor Island Drive has two well-marked left turn lanes, with large left arrows and "SIGNAL AHEAD" markings on the pavement. The traffic signal at the intersection contains a lighted green arrow showing when a left turn is permissible. To the left and above the traffic signal is a sign with two left arrows. The left turn is at a 90-degree angle. The right turn begins earlier and is a soft curved right turn.

As Margaret was attempting to make a left turn onto Main Harbor Island Drive from one of the left turn lanes on South Harbor Island Drive, she failed to negotiate the turn and instead drove over an unguarded curb and into the San Diego Bay. The vehicle went under the water with both occupants trapped inside. After several minutes, emergency personnel removed the Johnsons. Both died within several days.

Plaintiffs (Robert's estate and survivors) sued the Port, alleging the accident was caused by the dangerous condition of the Port's property.[3] (See § 835.) The Port moved

---

[3] Margaret's heirs/beneficiaries also sued, but settled before trial began.

for summary judgment on the grounds that: (1) the public property was not in a dangerous condition; and (2) the action was barred by a public entity's discretionary design immunity (§ 830.6). The court denied the motion, finding triable factual issues on whether the T-intersection constitutes a dangerous condition and whether there was discretionary approval of the design plans and/or deviation from applicable standards. The Port petitioned this court for a writ of mandate seeking to overturn the court's ruling. This court summarily denied the petition.

Plaintiffs' expert, experienced traffic engineer Harry Krueper, thereafter testified at his deposition that although he did not believe the physical design of the intersection was "wrong," he found the T-intersection to be unsafe. Krueper said: "[T]here was no form of . . . advanced warning sufficient to tell the person that the roadway ends for straight-through traffic. There was no curve warning sign advisory, as well as an advisory speed demarcation before you reached the intersection itself." Krueper also said: "[T]here is a slight cresting of the hill on the roadway that does not allow you to see out at night into the bay to notice the water out there. Daytime you can see it, but not at nighttime, which would call for a sign and marking of some type to identify that the road routing definitely changes." After discussing evidence that the curb at the top of the intersection had various marks indicating to Krueger that numerous other cars had misjudged the sharpness of the left turn, Krueper stated:

> "So I felt that an unsafe condition was allowed to exist, was not
> thoroughly investigated. There was no form of warning as to the
> need for a reduced speed for left turns. Not necessarily for right
> turns, but for left turns because of the physical conditions of the
> roadway. [¶] I am not saying it was designed wrong, no. It's not a

4

design immunity from traffic engineering that I'm looking at. I'm looking at the method of operation. I'm looking at you have a 35-mile-per-hour approach speed sign. I have no objection to that, except you slow them down at the intersection and you identify the intersection. And that was not done."

Krueper further said: "A design element is something that calls for such items as radius of curvature, features like that. I have no objection to that. The thing is to making the driver aware that there is a limitation as to what it was on his approach. [T]hat's operational."

Relying on Krueper's opinions, in their trial brief plaintiffs asserted that a combination of factors made the T-intersection dangerous when used with due care. According to plaintiffs, the Port should have provided signs to warn drivers of the sharp left turn, the need to reduce speed in the turn, and the existence of the bay at the end of the T-intersection.

*Port's Motion in Limine No. 3*

Before trial, the Port filed Motion in Limine No. 3, requesting the court to exclude Krueper's "opinions and testimony that additional warning signs . . . would have prevented the subject accident." The Port stated the motion was "made on the grounds that any such opinions and testimony would be speculative . . . [and the Port] cannot be held liable for its alleged failure to provide warning traffic signals, signs, postings or markings." The Port argued it was immune from liability under sections 830.4, 830.6, and 830.8, and that the evidence should be excluded under Evidence Code sections 210, 350, and 352.

5

In opposition, plaintiffs argued that Krueper's opinions were relevant and the statutory immunities cited by the Port are affirmative defenses to be established at trial and are not proper grounds for excluding evidence.

At the hearing on the in limine motions, the Port's counsel said the Port was moving to exclude Krueper's testimony because Krueper admitted he had no criticisms of the intersection's "design," and instead his only objection was that the Port should have placed signs warning of the sharp left turn and the need to slow down while making the turn. The Port's counsel argued that section 830.4's traffic-sign immunity rule bars these opinions.[4]

Plaintiffs' counsel responded that section 840.4 is inapplicable because it applies to traffic or regulatory signals, and Krueper's opinion concerned only warning signs, which are governed by section 830.8. Plaintiffs' counsel also argued that section 830.4 applies only when the absence of a sign is the *sole* claimed cause of the plaintiff's injuries, and here there were multiple claimed causes. Plaintiffs' counsel argued Krueper should be permitted to testify at trial that the physical aspects of the roadway approach and intersection are such that they are dangerous absent a warning sign.

After considering these arguments, the court ruled that Krueper's testimony is "totally contrary to [section] 830.4" and "[a]s a matter of law, [Krueper] can't give that opinion." The court stated: "[Section] 830.4 says a condition is not a dangerous

---

4       The Port's counsel also discussed at length the design immunity defense. Because we do not reach the issue, we do not detail these arguments, or plaintiffs' response to the arguments.

condition within the meaning of this chapter merely because of a failure to provide regulatory traffic control signs, stop signs, yield right of way signs, or speed restrictions signs, et cetera. So the statute says Mr. Krueper can't say that." The court rejected plaintiffs' counsel's repeated arguments that section 830.4 is inapplicable because Krueper's opinions concern "warning" signs governed by section 830.8 and not "regulatory" signs governed by section 840.4. The court stated: "[A] speed warning sign is what [Krueper] is talking about. . . . [¶] . . . [¶] . . . I think that's 830.4. I don't think that gets in front of the jury. I don't think he can have that opinion . . . as a matter of statutory law."

Plaintiffs' counsel responded that the court's evidentiary ruling was "an outcome determinative ruling. . . . I cannot make a case without [Krueper's] testimony." The court then asked how "we preserve that in such a manner that [plaintiffs] can appeal . . . . [¶] . . . [¶] . . . If I'm wrong on this, I want you to have the opportunity to do what you think is appropriate." The court continued the hearing to the next day.

*Opening Statement/Offer of Proof*

The next morning, counsel informed the court they had agreed that plaintiffs' counsel would make an opening statement/offer of proof, and the Port would then bring a nonsuit motion. Both counsel indicated the nonsuit motion would be based on the opening statement, the documents and arguments presented on the Port's Motion in Limine No. 3, and the Port's written nonsuit motion submitted earlier that morning.

In his opening statement, plaintiffs' counsel described the T-intersection, and stated the current design has been in place since approximately 1990. Counsel showed

7

diagrams of the intersection, and (as detailed in Section III.D. below) identified various characteristics of the roadway that he said would deceive a reasonable driver to believe the left turn would be a wide curve rather than a sharp 90-degree turn and would conceal the existence of the bay beyond the intersection.

Plaintiffs' counsel said that based on these factors "[o]ur traffic engineer will testify that [the specified] warning signs are necessary to alert a reasonable driver of the necessity to reduce their speed and that a sharp turn is coming which would not be apparent or anticipated by a reasonable driver." Counsel then spoke at length about the difference between warning signs (governed by section 830.8) and regulatory signs (governed by section 830.4). Counsel said Krueper would identify four warning signs that should have been placed at or near the intersection: (1) an "advisory speed plate" warning drivers to slow to "15 MPH" for the left turn; (2) a left turn sign used to provide advance warning of a 90-degree sharp left turn; (3) a left arrow sign that would be placed at the south end of the T-intersection showing a sharp left turn; and (4) a "chevron alignment sign" also placed at the south end of the T-intersection showing a sharp left turn. Counsel also discussed and provided a copy of relevant portions of the California Department of Transportation traffic manual (Caltrans Manual) that distinguish between warning signs (including the above signs) and "regulatory" signs.

Plaintiffs' counsel also discussed prior incidents at the intersection, including a May 2008 incident during which a driver accidentally drove into the bay from South Harbor Island Drive. Plaintiffs' counsel said the driver would testify at trial that "she was unfamiliar with the road at night; she was going fast . . . she saw that expanse of black . . .

8

but she didn't know as the bay, assumed it was a road, until she approached the intersection, saw grass behind the red curb, between the curb and the bay, and slammed on the brakes.  Her vehicle hit the curb, launched into the bay, went in nose first, and rolled over."  Plaintiffs' counsel said the Port knew about the incident, but took no action to prevent similar accidents or warn motorists in the future.  Plaintiffs' counsel also discussed evidence showing that the south curb of the T-intersection contains "gouges indicative of wheel contact and obvious tire marks, indicating that other vehicles . . . had difficulty navigating that turn."

Based on these facts, plaintiffs' counsel argued that section 830.4 was inapplicable because the statute concerned only "regulatory signs," and plaintiffs were claiming that multiple factors made the intersection dangerous, not merely the lack of a sign.  Plaintiffs' counsel also stated that the "immunity of [section] 830.8 . . . does not apply because the warning signs were necessary to alert an approaching motorist of a dangerous condition, especially at night, that would not be . . . readily apparent to, or anticipated by, a careful motorist.  The standard of care and good engineering judgment required the placement of the signs . . . in order to make the intersection safe . . . ."

When plaintiffs' counsel inquired whether he should address the design immunity issue (§ 830.6), the court indicated this was not necessary as the Port was not relying on section 830.6 for its motion.  The Port's counsel agreed.  Specifically, the following discussion took place during plaintiffs' counsel's opening statement after he discussed the section 830.4 and 830.8 immunities:

9

"[Plaintiffs' counsel]: The other immunity that's been asserted is discretionary immunity. Your Honor has ruled on that in summary judgment. I don't see any need to go into that right now, unless it's going to be an issue. If you can give me some guidance on that, I'd appreciate it."

"The Court: I don't know if [the Port's counsel] considers that an issue at this stage."

"[Port's counsel]: Not at this stage, your Honor."

"[Plaintiffs' counsel]: Okay. All right, I'll skip that."

*Nonsuit Motion Arguments and Ruling*

After the opening statement, the Port's counsel urged the court to grant the nonsuit motion, stating "we really heard nothing new today" and reiterating that plaintiffs' claim is barred by section 830.4. In response, plaintiffs' counsel repeated his argument that section 830.4 is inapplicable because that section pertains to regulatory signs, not to warning signs. Plaintiffs' counsel also argued that the warning signs identified by Krueper "are relevant and material both to dangerous condition and the immunity of [section] 830.8 . . . , both of which are jury questions, not questions of law."

The court then reaffirmed its finding that section 830.4 barred the claim, stating: "[A]s we talked about, I'll grant the Port's nonsuit motion. That's the right vehicle to preserve these issues. . . . That would allow the appellate court to review whether or not these Government Code sections apply in this type of circumstance or not. I won't repeat all of the discussion[s] we had yesterday."

The final judgment states the court granted the Port's nonsuit motion "on the grounds . . . section 830.4 prevents plaintiffs from establishing that the Port District's

10

property at issue was in a dangerous condition at the time of the accident . . . ."  The court based its ruling on the plaintiffs' "offer of proof and/or an opening statement," the parties' pleadings, "all lodged and filed documents in support of and in opposition to the parties' motions in limine," the parties' trial briefs, the Port's brief in support of its nonsuit motion, and counsels' arguments on the motions in limine and nonsuit motion.

## DISCUSSION

### I. *Applicable Law Governing Government Tort Liability*

A governmental entity is not liable for an injury unless liability is specifically permitted by a statute.  (§ 815.)  Section 835 states that a public entity may be held liable for a dangerous condition of public property under certain circumstances.  (See *Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1126; *Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 68.)  To establish liability under section 835, a plaintiff must prove:  (1) the property was in a "dangerous condition"; (2) the injury was proximately caused by the dangerous condition; (3) the dangerous condition created a reasonably foreseeable risk of the kind of injury that occurred; and (4) the public entity had the requisite actual or constructive notice of the dangerous condition to permit it to "protect against" the condition, or the injury was caused by a public employee's wrongful act.  (§ 835.)

"Dangerous condition" means "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used."  (§ 830, subd. (a).)  A third party's negligent use of the

11

property does not negate the existence of a dangerous condition; the plaintiff need not show property was actually being used with due care at the time of the injury. (*Mathews v. State of California ex rel. Department of Transportation* (1978) 82 Cal.App.3d 116, 121; *Murrell v. State of California ex rel. Dept. Pub. Wks.* (1975) 47 Cal.App.3d 264, 267.)

These liability rules are subject to various exceptions/immunities, three of which are potentially applicable in this case. First, as discussed in more detail below, section 830.4 excludes from the "dangerous condition" definition a condition resulting "merely" from the failure to provide certain specified "regulatory" traffic control devices or signs. (§ 830.4; see fn. 1, *ante*.) Second, section 830.8 provides governmental immunity for the failure to provide signs "*other than [those identified] in Section 830.4*," unless the sign was "necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care." (§ 830.8, italics added; see fn. 2, *ante*.) Third, section 830.6 provides a public entity is immune for design defects under certain circumstances, including where there was prior discretionary approval of the design plans.

Under these governmental liability and immunity statutes, we consider plaintiffs' claims that the court erred in granting the Port's motion in limine to exclude plaintiffs' expert's testimony and granting the Port's nonsuit motion.

12

## II. *Motion in Limine*

Plaintiffs contend the court erred in refusing to permit their expert to testify that the Port's failure to provide speed advisory and turn warning signs created a dangerous condition at the T-intersection.

### A. *Review Standard*

" 'In limine motions are designed to facilitate the management of a case, generally by deciding difficult evidentiary issues in advance of trial.' [Citation.] . . . [H]owever, motions in limine also can function as 'an objection to any and all evidence on the grounds [the] pleadings [are] fatally defective' for failure 'to state a cause of action.' [Citation.] In such cases, the in limine motion 'operate[s] as a general demurrer to [the] complaints or a motion for judgment on the pleadings.' [Citations.] 'Alternatively,' where such motions are granted 'at the outset of trial with reference to evidence already produced in discovery, they may be viewed as the functional equivalent of an order sustaining a demurrer to the evidence, or nonsuit.' " (*City of Livermore v. Baca* (2012) 205 Cal.App.4th 1460, 1465.)

"When . . . the court's order excludes all [or the essential] evidence on a particular claim and, as a result, operates as a motion for nonsuit, we review the court's order de novo, examining the record in the light most favorable to the party offering the evidence. [Citation.] In such cases, 'all inferences and conflicts in the evidence must be viewed most favorably to the nonmoving party.' [Citation.]" (*City of Livermore v. Baca, supra*, 205 Cal.App.4th at p. 1465.)

13

B. *Analysis*

Generally, all relevant evidence is admissible except as otherwise provided by a statutory or constitutional rule. (Evid. Code, § 351.) The court excluded Krueper's opinions based on its conclusion they were irrelevant under section 830.4. Specifically, the court found Krueper's dangerous-condition opinion was based on the Port's failure to provide a speed restriction sign and determined that section 830.4 provides an absolute immunity for liability on this ground.

On appeal, plaintiffs challenge these findings on two levels. First, they argue that section 830.4 applies only when the failure to provide a listed sign was the *sole* reason for the claimed dangerous condition (*Washington v. City and County of San Francisco* (1990) 219 Cal.App.3d 1531, 1535-1536 (*Washington*)), and Krueper's opinion was that numerous factors created the dangerous condition. Second, they argue section 830.4 is inapplicable as a matter of law because it applies only to the regulatory traffic control devices specified in the statute, and Krueper did not base his opinion on any of these specified devices. Because we agree with the latter argument, we do not reach the first argument for purposes of reviewing the order granting the motion in limine.

Section 830.4 states: "A condition is not a dangerous condition within the meaning of this chapter merely because of the failure to provide regulatory traffic control signals, stop signs, yield right-of-way signs, or *speed restriction signs*, as described by the Vehicle Code . . . ." (Italics added.) With respect to the alleged failure to provide *other* types of official traffic signs, section 830.8 applies and provides a qualified immunity.

14

The court found section 830.4 governed and required it to exclude Krueper's opinions because one of the signs identified by Krueper—the turn advisory speed sign ("15 MPH")—is a "speed restriction" sign within the meaning of section 830.4. This conclusion was erroneous.

First, the court's conclusion did not provide a basis to exclude Krueper's opinion regarding the other signs (e.g., the sharp-left-turn sign, the chevron warning sign) that clearly do not fall within the scope of section 830.4. Second, viewed in context of the entire statute, a "speed restriction sign" refers to a particular type of maximum speed sign that does not include the *turn-speed* warning sign at issue here. As explained, the advisory speed sign identified by Krueper falls within section 830.8, and not section 830.4.

Section 830.4 applies to "speed restriction signs, *as described by the Vehicle Code*." (Italics added.) The Vehicle Code describes a "speed restriction" sign to mean signs that identify the maximum speed limit that is "different from the limit otherwise applicable" under the generally applicable presumptions set forth in Vehicle Code sections 22349 and 22352. (Veh. Code, § 21359; see also Van Alstyne et al., 2 Cal. Government Tort Liability Practice (Cont.Ed.Bar 4th ed. 2012) § 12.75, p. 966.) Under these code sections, a "speed restriction" sign is a sign that reflects a regulatory decision to alter the presumptive maximum speed limit on a portion of a highway or roadway. (Veh. Code, § 21359.) A "speed restriction" sign may also be placed at entrances to business or residential districts and district boundaries to clarify the appropriate maximum speed limit. (Veh. Code, §§ 21357, 21358.) Under these statutes, a "speed

15

restriction" sign does not include a sign warning that a lower speed is recommended for a turn due to a particular unsafe condition.

This conclusion is supported by section 830.4's inclusion of the word "regulatory" to describe the types of signs to which the statute applies. (§ 830.4.) To provide meaning to this word, the courts have interpreted section 830.4 to apply only to "regulatory" signs as opposed to "warning" signs. (See *Dahlquist v. State of California* (1966) 243 Cal.App.2d 208, 213 [noting that section 830.4 applies to "*regulatory* traffic-control devices" rather than "*warning* signs and devices" that are subject to section 830.8]; 2 Cal. Government Tort Liability Practice, *supra*, § 12.76, p. 969; see also *Mixon v. Pacific Gas & Electric Co.* (2012) 207 Cal.App.4th 124, 135 [distinguishing between " 'regulatory' " devices and "warning sign[s]" in interpreting sections 830.4 and 830.8].)

This regulatory-warning distinction has also been applied by the California Department of Transportation (Caltrans), which is the agency charged with adopting rules and regulations regarding traffic control devices, including regulatory and warning signs. (Veh. Code, § 21400.) According to the Caltrans Manual, the types of signs listed in section 830.4 (including stop signs, yield signs, and maximum speed restriction (or limit) signs) are "regulatory" signs; whereas "warning signs" are signs that "alert vehicle operators" of the need to "use caution" or "*reduce* speed." (CalTrans, Traffic Manual (2006) ch. 4, Signs, §§ 4-01.7, 4-01.10, 4-02.1, 4-02.4, 4.03.1, accessible at http://www.dot.ca.gov/hq/traffops/signtech/signdel/trafficmanual-current.htm [as of Dec. 26, 2013], italics added.) Each of the signs that Krueper opines should have been placed at or near the T-intersection are identified in the Caltrans Manual as "warning signs"

16

(falling within section 830.8) and not "regulatory signs" (falling within section 830.4). This includes the sign warning a driver to reduce speed at a turn or curve.

Although we have not found a reported decision that specifically addresses the meaning of a "speed restriction sign," courts have long assumed that section 830.8 (rather than section 830.4) applies where the issue concerns the public entity's failure to provide a warning that a turn or curve should be driven at a speed lower than the generally applicable speed limit. (See *Cameron v. State of California* (1972) 7 Cal.3d 318, 327, [finding that public entity was not immune under section 830.8 where plaintiff alleged that accident was caused by the lack of a proper warning of a dangerous curve and failure to post a safe speed]; *Anderson v. City of Thousand Oaks* (1976) 65 Cal.App.3d 82, 93.)

In its respondent's brief, the Port acknowledges that section 830.4 applies only to "regulatory" as opposed to "warning" signs, and does not argue that the signs identified by Krueper were regulatory signs. Although at one point the Port asserts that "[s]igns warning motorists to slow down before making a left turn" are " 'speed restriction' " signs within the meaning of section 830.4, the Port cites no relevant authority and makes no reasoned argument supporting this position.

We conclude the court erred in granting the Port's motion in limine based on section 830.4. We thus turn to the issue whether the court properly granted a nonsuit assuming section 830.4 did not bar Krueper's testimony.

17

### III. *Nonsuit*

#### A. *Review Standards*

"A defendant is entitled to nonsuit if the trial court determines as a matter of law that the plaintiff's evidence, when viewed most favorably to the plaintiff under the substantial evidence test, is insufficient to permit a jury to find in his favor." (*Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 713.)  Where, as here, the nonsuit was based on the counsel's opening statement, we must assume the plaintiff can prove all the stated facts.  (*Michael E. L. v. County of San Diego* (1986) 183 Cal.App.3d 515, 533.)

A nonsuit after the opening statement is not favored and is rarely granted. (*Galanek v. Wismar* (1999) 68 Cal.App.4th 1417, 1424; *John Norton Farms, Inc. v. Todagco* (1981) 124 Cal.App.3d 149, 171-172.)  A nonsuit is warranted only if it is clear there will be no evidence of sufficient substantiality to support a judgment in the plaintiff's favor.  (*Willis v. Gordon* (1978) 20 Cal.3d 629, 633; *Ewing v. Northridge Hospital Medical Center* (2004) 120 Cal.App.4th 1289, 1296.)  Affirmative defenses generally do not support a nonsuit because a plaintiff does not have the burden to negate the applicability of an affirmative defense in the opening statement.  (See *Inderbitzen v. Lane Hospital* (1932) 124 Cal.App. 462, 465-466.)  However, a nonsuit motion may be granted if the opening statement contains " 'uncontrovertible proof' " of the applicability of the affirmative defense.  (*Galanek, supra*, 68 Cal.App.4th at p. 1424; *Abeyta v. Superior Court* (1993) 17 Cal.App.4th 1037, 1041.)

We review a nonsuit de novo.  (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541-1542.)

B. *Overview*

The court granted a nonsuit based on section 830.4. For the reasons set forth in Section II above, the court erred in doing so.

The Port argues that even if section 830.4 does not apply, the judgment must be affirmed based on two other governmental immunities—section 830.8 and section 830.6. Generally, after an opening statement, a nonsuit may be granted only on the grounds asserted by the opposing party. However, a reviewing court may affirm a nonsuit based on another ground if the record shows the plaintiff had the full opportunity to present the facts relevant to this ground in the opening statement and the asserted facts show plaintiffs cannot recover on their claim. (*Timmsen v. Forest E. Olson, Inc.* (1970) 6 Cal.App.3d 860, 868; see *Lawless v. Calaway* (1944) 24 Cal.2d 81, 94; *Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1595.)

Under these principles, we determine the nonsuit was proper under section 830.8. As explained below, the section 830.8 immunity defense was applicable on the face of plaintiffs' claim and plaintiffs' counsel had the full opportunity to articulate facts that would overcome the defense, but counsel's opening statement (together with plaintiffs' documents and photographs) show plaintiffs would be unable to present facts satisfying the statutory standard.

C. *The Section 830.8 Immunity*

Section 830.8 states:

> "[A public entity is not] liable . . . for an injury caused by the failure to provide traffic or warning signals, signs, markings or devices described in the Vehicle Code. Nothing in this section exonerates a

19

public entity . . . from liability for an injury proximately caused by such failure if a signal, sign, marking or device (*other than one described in Section 830.4*) was necessary to warn of a dangerous condition *which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care*." (Italics added.)

Courts have long referred to this limited immunity rule as the "concealed trap" exception because the statute requires a plaintiff seeking to hold a public entity liable for the failure to post a warning sign to show the dangerous condition would not be apparent to, or anticipated by, a person exercising due care. (*Chowdhury v. City of Los Angeles* (1995) 38 Cal.App.4th 1187, 1196-1197; see *Washington, supra*, 219 Cal.App.3d at pp. 1536-1537; *Kessler v. State of California* (1988) 206 Cal.App.3d 317, 321-322; *Callahan v. City and County of San Francisco* (1967) 249 Cal.App.2d 696, 704; see also *Cameron v. State of California, supra*, 7 Cal.3d at p. 327, fn. 12; *Mixon v. Pacific Gas & Electric Co., supra*, 207 Cal.App.4th at p. 136; 4 Cal. Law Revision Com. Rep. (1963) p. 851.) In other words, the plaintiff must show the dangerous condition was hidden or concealed, essentially constituting a "trap" to a driver or pedestrian. (*Washington, supra*, 219 Cal.App.3d at pp. 1536-1537.)

### D. *Opening Statement*

In his opening statement, plaintiffs' counsel discussed at length the grounds for plaintiffs' claim that the T-intersection and left-turn lane presented a dangerous and concealed condition. He stated this claim was based on various factors, including that: (1) at nighttime a driver on South Harbor Island Drive would not necessarily see the bay and would not know the road ends; (2) the approach to Main Harbor Island Drive is

20

"curvy"; (3) South Harbor Island Drive meets Main Harbor Island Drive "at a slight curve"; (4) there is a crest in the road that obscures or blocks the driver's view of the intersection until immediately before the intersection; (5) a driver intending to turn left onto Main Harbor Island Drive can see that the *right turn* is "wide and sweeping"; (6) there are trees in the approach to Main Harbor Island Drive obstructing a driver's view to the left; and (7) there is a 35-miles-per-hour sign on South Harbor Island Drive before the T-intersection.

Plaintiffs' counsel also displayed and discussed photographs of the relevant area. These photographs and counsels' statements showed that:  (1) the left turn lanes on South Harbor Island Drive are each painted with large left turn arrows that begin approximately several hundred feet in advance of the intersection; (2) the roadway is painted with large "SIGNAL AHEAD" advisories, one in each lane; (3) the two left turn lanes are separated by a painted white line that continues into the left turn (a portion of which may have been "scuffed out" at the time of the accident); (4) the elevated traffic signal is located on the bay side of the T-intersection and has three lights facing the intersection; (5) the traffic signal contains arrows reflecting that vehicles in the two left southbound lanes are *required* to turn left and prohibiting U-turns; and (6) the intersection has standard lighting at night.

Relying on his statements and the photographs, plaintiffs' counsel stated:  "So you have a combination of the physical configuration of the roadway and these deceiving cues, especially at night, in the absence of a background, and there are no warning signs telling a reasonable driver to reduce their speed in half to safely make that turn, or telling

21

a driver that the road ends abruptly in a 90-degree turn, rather than in a wide curve, which the ambiguous or deceiving cues indicate. [¶] . . . Our traffic engineer [Krueper] will testify that warning signs are necessary to alert a reasonable driver of the necessity to reduce their speed and that a sharp turn is coming which would not be apparent or anticipated by a reasonable driver." Counsel also asserted: "The immunity of section 830.8 . . . does not apply because the warning signs were necessary to alert an approaching motorist of a dangerous condition, especially at night, that would not be . . . readily apparent to, or anticipated by, a careful motorist. The standard of care and good engineering judgment required the placement of the [warning] signs . . . . So immunity of [section] 830.8, therefore, does not apply."

E. *Analysis*

The record before us—including counsel's opening statement and the documents and arguments relied upon by plaintiffs' counsel and the court—makes clear that plaintiffs cannot overcome the section 830.8 sign immunity defense. Specifically, there is no evidence the accident was caused by a dangerous condition that "would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care." (§ 830.8.) Although plaintiffs' counsel asserted during opening statement (and Krueper opined) that the "sharp" left turn would not be anticipated by a reasonable driver, plaintiffs' evidence defeats that claim. Based on the photographs showing the signal, signs, and markings existing on the night of the accident, there is no question but that a reasonable driver would understand the need to turn left at the T-intersection. It is undisputed that Margaret was in the left-turn lane and was beginning to turn left when the

22

vehicle instead veered straight over the grass and into the bay.  There were multiple advisories—including large pavement markings and a signal light with a left turn arrow—about the need for a driver in the left two lanes to turn left.  Given these advisories, the requirement that a driver was required to turn left at this intersection cannot be considered a concealed danger.  Similarly, the fact that the turn was at a 90-degree angle is not a hidden or concealed danger.  A 90-degree turn is not an unusual or unique circumstance.  The fact that the right lane had a wide turn or that there was a very slight curve at the inception of the left turn does not logically show a hidden danger.

These circumstances are materially different from those in *Anderson v. City of Thousand Oaks, supra*, 65 Cal.App.3d 82, relied upon by plaintiffs.  In *Anderson*, a road with a 65-miles-per-hour speed limit abruptly curved in a 65-degree arc.  (*Id.* at pp. 86, 93.)  A driver and passenger were killed when the driver failed to negotiate this unmarked curve.  At the time of the accident, the road had been open for only one month, and there were no signs or roadway striping of any kind to warn drivers of the upcoming hidden curve.  (*Id.* at p. 86.)  The Court of Appeal found there were triable factual issues on the section 830.8 defense, observing that the circumstances of the unmarked curve essentially "constitute[ed] a trap to the motorist."  (*Id.* at p. 93.)

Unlike in *Anderson*, the left turn here was not hidden or concealed or unexpected.  Any reasonably careful driver in the left two lanes would know from the highway markings and the signal left-turn indicator light and the left-turn sign above the traffic signal that there was a left turn and generally such turns are 90 degrees.  In *Anderson,* the road suddenly curved with no signal or marking or sign.  Here, the driver was in a left

23

turn lane and was informed that the road turned left and that he or she was required to make a left turn in that lane.

Plaintiffs argue the nighttime photographs show, and their expert's opinion supports, that a driver would not have necessarily understood this was a T-intersection and that the bay was on the other side of the intersection. However, even assuming it would be difficult for a driver to see the water or fully comprehend that this is a T-intersection, it is undisputed that Margaret was in the left lane and that the existing signs informed her she *must* turn left. There were no facts in the case showing that a reasonable person in the left turn lane would believe he or she was entitled to go straight from the left turn lane. A reasonable person would either see or appreciate the danger of ignoring the signs and driving straight from the left turning lane. In designing public roads and determining whether to post warning signs, a public entity is permitted to expect that individuals will act with due care. (§ 830.8; see *Fredette v. City of Long Beach* (1986) 187 Cal.App.3d 122, 131-132.)

In seeking to avoid the section 830.8 bar, plaintiffs rely on Krueper's deposition testimony and declaration (submitted in connection with the earlier summary judgment proceedings) wherein he opines that there was "insufficient guidance" for a driver to understand the need to slow down from the 35 miles per hour speed limit to safely make the "sharp" left turn. These opinions are unhelpful regarding the legal issue before us. The Legislature has decided that a public entity is absolutely immune from accidents resulting from the entity's failure to post warning signs *unless* there is a hidden danger that would not be understood or anticipated by a person exercising due care. (§ 830.8.)

24

Krueper did not identify any hidden or concealed conditions. Instead, Krueper specifically acknowledged that the design of the roadway and the turn were appropriate, and stated only that additional warning signs should have been provided to assist the driver in safely making the left turn. This opinion does not reveal a hidden danger. Moreover, to the extent Krueper's opinions could be interpreted as suggesting a concealed, dangerous condition, he did not articulate any reasonable factual basis for this opinion. An "expert opinion may not be based on assumptions of fact that are . . . speculative or conjectural, for then the opinion has no evidentiary value and does not assist the trier of fact." (*Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 510.)

The undisputed record shows that neither the fact of the left turn, nor the angle of the left turn, was hidden from a reasonable driver. Even if a driver could have reasonably believed the left hand turn lane was wider than it was, this discrepancy does not constitute a hidden dangerous condition. "[T]he simple absence of a warning sign cannot create liability unless there is a hidden dangerous condition." (*Weinstein v. Department of Transportation* (2006) 139 Cal.App.4th 52, 61.)

Plaintiffs argue that because "section 830.8 was not a basis for the Port's motion for nonsuit," the Port cannot prevail on this theory on appeal. However, on our review of the opening statement, we are satisfied that plaintiffs' counsel understood the need to address the section 830.8 immunity issue and that plaintiffs had the opportunity to fully state the evidence that would show the immunity did not apply. Moreover, plaintiffs have not identified any facts in their appellate briefs showing a basis for concluding the

25

case falls outside the section 830.8 immunity statute.  Under these circumstances, it is appropriate for this court to decide the appeal based on section 830.8.  (See *John Norton Farms, Inc. v. Todagco, supra*, 124 Cal.App.3d at p. 161.)

Because the nonsuit and judgment must be affirmed on the section 830.8 immunity statute, we do not address the parties' contentions regarding the design immunity statute (§ 830.6), and we deny the related judicial notice motion filed by the Port.

### DISPOSITION

Judgment affirmed.  The parties to bear their own costs.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

McINTYRE, J.

26